552 A.2d 570

**In re DANIELLE B. & Deon A.**

**No. 1066, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Jan. 20, 1989.

Mitchell Y. Mirviss, Baltimore, for appellant-children.

Donna R. Heller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant, Baltimore City Dept. of Social Services.

James Henry Montgomery, Jr., Baltimore, for appellee-Mother.

Marianna I. Burt, Asst. Public Defender and Alan H. Murrell, Public Defender, Baltimore, on the brief, for appellee-Fathers.

Argued before BISHOP, ROSALYN B. BELL and JAMES S. GETTY (Retired, Specially Assigned), JJ.

BISHOP, Judge.

## I.

## FACTS

During the afternoon of February 23, 1987, Officer Robert Ward of the Baltimore City Police Department responded to a call from 13 year old Danielle B. who alleged that she was the victim of child abuse. Danielle, who was pregnant and suffering from a venereal disease, met with the officer in the parking lot of a shopping center where she gave him a report. She told the officer that her step-father beat her frequently and that she was afraid to go home. She told Officer Ward that earlier that afternoon her step-father had hit her in the chest and had beaten her around the buttocks with a leather belt; however, the officer, who did not conduct a physical examination, later testified that he did not observe any scars or bruises on Danielle. Officer Ward transported Danielle to a police station and, after further questioning, Danielle revealed that sometime during late November 1986, her step-father placed his hand inside her panties and put "passion" marks on her neck. The officer called the Department of Social Services (the Department) who took custody of Danielle.

The following day, the Department filed a CINA [1] petition on behalf of Danielle. The petition alleged that she was the victim of physical and sexual abuse. It also stated that the Department had placed Danielle in shelter care. Later that day, an emergency shelter care hearing was conducted by the juvenile master.[2] The master ordered that Danielle remain in shelter care pending the outcome of an adjudicatory hearing. She also ordered that the Department interview Deon A., Danielle's eight year old half-brother, and that the Department give Danielle pregnancy counseling.

On February 24, 1987, Deon told the Department that he, too, was physically abused by his step-father and that he had observed his step-father beating Danielle. As a result, the Department placed Deon in shelter care as well. The next day, February 25, 1987, the Department filed a CINA petition on behalf of Deon. An emergency hearing was held that day and the master ordered shelter care continued pending the outcome of an adjudicatory hearing.

An adjudicatory hearing for both children was conducted before a master on four separate days: March 17, 1987; April 2, 1987; April 27, 1987 and May 12, 1987. The Department presented testimony from four witnesses: Officer Ward, Danielle, Deon and Ms. Peggy Shumate, Deon's therapist.

Danielle testified that her step-father had lived with her mother since September of 1986, when they were married. Danielle testified that several incidents of physical and sexual abuse were inflicted upon her from the time of her step-father's arrival until February 23, 1987, the day that she was removed from her home and placed in shelter care. She also testified that on one occasion, when she began cleaning the family's living room and wanted to clean the tables before cleaning the floor, her step-father insisted that she clean the floor first. When she refused, he slapped

---

1. See footnote 9, p. 49, *infra.*

2. *See* Maryland Rules 911 and 912.

her face. On another occasion, her step-father wanted a hug and a kiss and when Danielle refused, he threw her to the floor, climbed on top of her, sat on her stomach with his knees pinning her arms to the floor, and slapped her face. Danielle attempted to escape and yell for help, but neither her mother, who was upstairs, nor her step-father's brother, Joe, who was standing nearby, came to her aid. The step-father placed plastic rollers in Danielle's mouth and slapped her face several times to quiet her. Joe told the step-father that he was being too rough and the step-father released Danielle. Danielle told her mother what had happened, but her mother said, "we're even because of what [you've] done".

Danielle testified that when she observed her step-father beat Deon across his back with a leather belt, she started screaming and ran from the room. Her step-father ran after her, caught her, beat her across her legs and side with a belt and forced her to return to the room to watch Deon's beating. On another day, in the presence of her mother, the step-father put Vaseline on Danielle's exposed breasts so he could do a "suction". Danielle did not know what a "suction" was, but she did not want her step-father to perform one again. The next night, when the step-father attempted to do another "suction", Danielle refused and ran to her mother. The stepfather became angry and threw a bottle at Danielle. The bottle did not hit her. She also reported that her step-father took her to a dentist and while in the dentist's office, with several people present, including the dentist, the step-father placed his hands inside her panties. On another occasion, the step-father put "passion" marks on Danielle's neck while in the presence of her mother who did nothing.

Danielle told the master that she became pregnant by Joe, her step-father's brother, who had resided temporarily with Danielle's family for an unknown length of time. She said Joe would frequently awaken her in the middle of the night and have sex with her. Her step-father and mother were usually at home while this occurred, although Danielle

admitted that they might not have been aware of Joe's behavior. Danielle admitted that she never told anyone about Joe's sexual relations with her.[3]

On February 23, 1987, the day she spoke with Officer Ward, Danielle looked into her mother's purse to get Deon's father's phone number.[4] The step-father discovered that Danielle had gone into the purse and became angry. Danielle told the step-father that she "wasn't comfortable being around him" but could not explain to him why. The step-father told Danielle to take off her clothes and he beat her on her side and back with a belt. He also pinched Danielle's chest, which left a mark. Afterwards, Danielle asked her mother if she could buy a pair of stockings and the mother told the step-father to give Danielle ten dollars to make the purchase. Danielle went to the shopping center and called the police and then talked to Officer Ward. Danielle also testified, however, that she lied when she told her aunt that her aunt's father had touched her in a sexually inappropriate way.

Deon testified that incidents of physical abuse were inflicted upon him. On one occasion, the step-father beat Deon on his buttocks with a belt while Deon was wearing nothing but his underwear. The mother was present yet did nothing to stop the beating. On another occasion, Deon received a beating from the step-father which resulted in the need for medical treatment. There were bruises but no bleeding. Danielle observed this beating. Afterwards, the

---

**3.** Although not part of the record before the master, at the hearing before Judge Mitchell on the shelter care issue, Irene Wozny, attorney for the children, proffered that:

Danielle asserts her mother had to have known of these occurrences because Joe made Danielle go into the bathroom and flush the toilet in succession in order to cover the noise. And she also states that Joe was creeping around the house at night, and her mother must have heard these goings on. Additionally, Joe used to go to school and follow Danielle around before and after school.

**4.** Danielle and Deon have different fathers but share the same mother.

step-father rubbed alcohol onto Deon's bruises. Again, the mother was present but did nothing. Deon was given these beatings because he had taken a watch from another boy at school and because he had taken $15.00 from his step-father's drawer without permission. Deon stated, however, that he took his step-father's money to make up the difference for items he was told to purchase but for which he was not given enough money.

Deon also observed his step-father beating Danielle on several occasions. Deon stopped calling his step-father "Daddy" after Danielle told him not to do so. The step-father gave Deon money for completing household chores. Deon acknowledged that his step-father treated him like a son and that he was good to him.

Ms. Shumate, a family counselor assigned to Deon by the Department following Deon's placement in shelter care, testified that Deon told her that, while naked, he had been beaten by his step-father with an extension cord or a belt and that the step-father later put alcohol on his bruises. Deon also related that he had seen his sister beaten, that she was pregnant and that he had seen his step-father put hair rollers in Danielle's mouth. Ms. Shumate indicated that she believed that any form of physical discipline is an inappropriate method of structuring children's behavior. Ms. Shumate, however, specifically stated that she did not believe that beatings, in and of themselves, were the equivalent of child abuse.

At the conclusion of the adjudicatory hearing, on May 12, 1987, the master recommended that the parents' motion to dismiss the petitions be granted on the grounds that the Department had failed to make a *"prima facie* case" that the children were in need of assistance. The master concluded that, "Danielle B. was not believable. I didn't believe anything she said." The master also concluded, "I got the impression that both children resent the relationship that the mother has entered into and I feel much of their

testimony was fabricated."[5] Later that same day, counsel for the children filed, on behalf of both of them, Notice of Exceptions to the master's oral recommendations. One of the exceptions covered the dismissal issue and the second exception covered the master's refusal to recommend continued shelter care. In each, the children asked specifically for *de novo* review of the master's recommendations. Also on May 12, 1987, following the master's oral recommendations, the Department filed a single Notice of Exception which addressed both the dismissal and shelter care issues.[6] The Department specifically asked for "on the record" review of the master's recommendation. On May 13, 1987, the Department filed a Notice of Exceptions which raised the shelter care issue and another which raised the dismissal issue. Each requested a hearing "on the record", and each was stamped by the clerk as being received on May 13, 1987, at 12:59 p.m. These two exceptions filed by the Department on May 13, 1987, were the only exceptions considered by the juvenile court to have been filed timely.[7] The master's report appears in the original court file and is dated May 13, 1987. Based on its location in the file, it appears to have been filed on that date; however, there is no indication on the report and no docket entry reflecting either when or that the report was actually filed, though it is unquestionably a part of the record. Stranger still, the report states that it was mailed to the parties on May 19, 1987.[8] The children, however, concede that their exceptions

---

5. The master also concluded that the children's shelter care placement should end.

6. This Notice of Exception is not contained in the record extract; we viewed it in the circuit court file.

7. Because the juvenile court ordered shelter care continued "pending the completion of the appellate process before the Court of Special Appeals", the issue of shelter care is not before us.

8. Chronologically, the master's report appears in the court's file ahead of the parties' exceptions. There is no docket entry for the report. The internal dates of the report are in conflict, yet its position chronologically in the court's record indicates a filing as early as May

were filed prior to the filing of the master's report. The court found that the children's exceptions were not filed timely and, therefore, it was not required to hold a *de novo* hearing.

## II.

## ISSUES

On July 14, 1987, the Circuit Court for Baltimore City (Mitchell, J.), sitting as a juvenile court pursuant to MD. CTS. & JUD.PROC.CODE ANN. § 3-801, *et seq.* (1984 Repl.Vol. and 1987 Cum.Supp.), dismissed the petitions of appellant, Baltimore City Department of Social Services which contained allegations that Danielle B. and Deon A. were "children in need of assistance".[9]

The children raise the following issue:

1.  Whether the children forfeited their right to a *de novo* adjudicatory hearing before the juvenile court when the children's formal exceptions to the juvenile master's recommendations were filed in advance of the master's written memorandum.

Both the children and the Department ask:

2.  Whether the juvenile court impermissibly delegated its judicial authority to the juvenile master by affirming the master's report in its entirety.

---

12, 1987, the date of the hearing, although all parties agree that the report was filed on May 13, 1987.

9.  Section 3-801(e) states:
    (e) *Child in need of assistance.*—"Child in need of assistance" is a child who requires the assistance of the court because
    (1) He is mentally handicapped or is not receiving ordinary and proper care and attention, and
    (2) His parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and his problems provided, however, a child shall not be deemed to be in need of assistance for the sole reason he is being furnished nonmedical remedial care and treatment recognized by State law.

3.  Whether the juvenile court's dismissal of the CINA petitions was an abuse of discretion.

## III.

### Issue 1

*Timeliness*

█ The children ask whether their right to a *de novo* hearing was waived because their exceptions to the master's recommendations were filed prematurely under Rule 911 c.[10]  Rule 911 c states in full:

c.  *Review by Court if Exceptions Filed.*

Any party may file exceptions to the master's proposed findings, conclusions, recommendations or proposed orders.  Exceptions shall be in writing, *filed with the clerk within five days after the master's report is served upon the party,* and shall specify those items to which the party excepts, and whether the hearing is to be de novo or on the record.

Upon the filing of exceptions, a prompt hearing shall be scheduled on the exceptions.  An excepting party other than the State may elect a hearing de novo or a hearing on the record.  If the State is the excepting party, the hearing shall be on the record, supplemented by such additional evidence as the judge considers relevant and to which the parties raise no objection.  In either case the hearing shall be limited to those matters to which exceptions have been taken.  (Emphasis added).

As we have noted, the children's exceptions were filed before the master's report was filed with the court and, also contrary to the Rule, before the master's report was served on them.

---

**10.**  We will later address the issue of whether the juvenile court should have exercised its discretion under Rule 911 d, regardless of the timeliness of the children's exceptions, to grant *de novo* review of the master's recommendations.

Dispositive of this issue is *Atlantic Food v. City of Annapolis*, 70 Md.App. 721, 523 A.2d 648 (1987). In *Atlantic* we said:

> To file a motion "within ten days" of judgment logically implies that the party files the motion within a discrete ten day period beginning with the entry of final judgment. Consequently, a court may not entertain motions prior to that judgment.

70 Md.App. at 730, 523 A.2d 648. We hold that "within five days" of the service of the Master's report means that the motion must be filed within a discrete five day period beginning with the date of that service.[11]

Since the children's exceptions were not filed within that discrete five day period required by the Rule, the court was technically correct in its interpretation of the Rule but, as we hold herein, there is something more required of a juvenile court judge besides the technical application of the rules.

IV.

Issue 2

*Impermissible Delegation*

and

Issue 3

*Abuse of Discretion*

In the "Memorandum From Master", dated May 13, 1987, but not mailed to the parties until May 19, 1987, the master formally recommended to the juvenile court that both petitions be dismissed. Rule 911 b in pertinent part requires the master to "transmit to the judge ... a written report of his proposed findings of fact, conclusions of law, recommendations and proposed orders with respect to adjudication

---

11. We do not address the question of the validity of an appeal filed after the master's report is filed in the court but before it is served on the party. It appears that this is the procedure followed by the State in the case *sub judice,* which the judge found to be timely.

and disposition." In the memorandum from the master dated May 13, 1987, the master advised the judge that "I dismissed [12] both petitions at the close of the Baltimore City Department of Social Services' case for its failure to make out a *prima facie* case for the following reasons...." We set out hereafter the allegations contained in the petitions filed by the Department and the reasons given by the master for her disbelief.

### Danielle

The petition filed on behalf of 13 year old Danielle contained the following allegations:

a. On February 23, 1987, at approximately 4:16 p.m. the police received a call of suspected child abuse.

b. Danielle stated that at 4 p.m. her stepfather became upset with her and struck her in the chest with his fists and on her buttocks with a belt.

c. Danielle alleged that stepfather has hit her several times in the past in the same manner but then applied an alcoholic substance so the scars and bruises would not show.

d. Danielle stated that her mother fails to protect her from stepfather.

e. Two aunts, Shirley and Janet, confirmed respondents' allegations and said they had tried to speak to respondent's parents, but without success. [The petition is not clear whether it was the abuse or the mother's failure to protect which was confirmed.]

f. Danielle alleged that stepfather put "passion marks" on her neck in November, and one time put his hand down her panties.

g. The police then contacted the Department who took Danielle to Union Memorial where she was examined and released to shelter care.

---

12. Obviously, the master has no power to dismiss, only to make such a recommendation to the court.

The basis for the master's conclusion that the Department had failed to make a *prima facie* case was that "Danielle's testimony was not believable". In support of this conclusion the master provided eight examples.

### (a.)

This thirteen year old made serious accusations of sexual impropriety on the part of one of the attorneys in this case. After the necessary waiver, she conceded *in camera* that her earlier assertion to her attorney was not true.

The first example is not included in the allegations; however, during the hearing, it was explained by Danielle to the apparent satisfaction of the master. After having discussed that issue *in camera* with Danielle the master made the following statement:

THE COURT: I think your concern is groundless. I've talked to Danielle and Danielle basically just does not like this gentleman. Initially she said that he had sexually abused her but then later she said basically what it is, she feels uncomfortable around him. She said that he stares at her and she said on one occasion he touched her neck. He has never said anything out of the way, but she just does not like him and she said she had told her stepfather previously that she didn't like him and the stepfather wanted to know why and she could not give a reason. She simply said that she knows when a man is looking at her in a suggestive manner and she felt that . . . . [counsel] might confuse her, and I indicated that he has a right to cross-examine her and other attorneys would be asking her questions also, so I think she should be allowed to testify.

### (b.)

After being interviewed by the involved officer about physical abuse later when at the station she spontaneously added that she had been sexually molested by her

stepfather. Same officer testified that he saw no bruis-
es.[13]

### (c.)

She testified that her stepfather put "passion marks" on her in the presence of her mother; he had placed Vaseline on her breast; he had attempted to kiss her and while in a dental chair, in the presence of others, the stepfather had placed his hands down her pants.

Although we can find nothing in the record to refute Danielle's testimony, the fact is that the master did not believe her. Whether this was error is a judgment for the trial court based on the standards which we discuss *infra*.

### (d.)

She told of having sex many times with stepfather's brother in her home; however, neither her mother nor stepfather knew this to be the case. She confided in her maternal aunts about physical and sexual abuse by stepfather, but did not tell them about her involvement with stepfather's brother.

The master apparently concluded that the mother and stepfather did not know about the alleged sexual abuse by the stepfather's brother on the basis of Danielle's testimony that she did not tell them.[14] Since the Department had the obligation of producing the testimony, we find it difficult to understand why the Department did not call the maternal aunts to testify. This is something that the trial court may wish to develop more fully.

### (e.), (f.) & (g.)

Danielle testified that she had not had problems relating to her mother until her mother's involvement with her stepfather; however, she testified that prior to this rela-

---

13. In addition, later Danielle testified that she told the police because one of her aunts had advised her to do so.

14. *See*, note 11, *supra*.

tionship she had lived with an aunt for an unspecified reason.

Danielle stated that her mother does not spend enough time with her children although she does help them with homework every now and then.

Danielle told an aunt that her boyfriend had touched her on the neck but not in a sexual manner. Similarly, she told the court that an attorney in this case touched her on the neck and this was a sexual overture.

### (h.)

When Danielle asked if she had stated that she had been sexually abused by others she retorted that she had said Lester had "messed" with her although this was a lie. She stated she had told her stepfather plenty of lies.

The fact that Danielle would make these admissions to the master should be considered by the trial court in evaluating the conclusion of the master that she did not believe the testimony.

The master failed to mention that Danielle was pregnant, had a venereal disease and that she named the stepfather's brother as the father. These are matters that should be considered carefully by the trial court.

### *Deon*

The petition filed on 8 year old Deon's behalf alleged the following:

a. The mother has failed to provide adequate care and protection for him and his sister.

b. The petition refers to Danielle's sheltering on February 23rd and her "confirmed physical and sexual abuse by the step-father".

c. At the February 24th shelter care hearing, Master Price ordered the mother and step-father to allow a Department worker to interview Deon. Upon being interviewed, Deon stated that he had been physically abused by the stepfather.

    d.  The mother has failed to protect Deon from beatings by the step-father with an extension cord and later applications of alcohol.

    e.  Deon reported hearing Danielle being beaten.

    f.  Deon's maternal relatives [presumably his aunt's Shirley and Janet] have tried to reach Deon's natural father to advise him of the situation without success.

    g.  The Department has tried unsuccessfully to reach Deon's natural father to determine his ability or willingness to provide care for Deon.

The Master gave six reasons as the bases for her conclusion that Deon's testimony was incredible.

### (a.)

Dion [sic] testified that he had been beaten with a belt by his stepfather who in turn applied alcohol to his body. On cross-examination he stated he had been beaten because of bad reports from school and for stealing at school as well as at home.

### (b.)

Dion [sic] testified as if he had been coached to give certain responses. Those questions that he obviously could answer but did not want to, for whatever reason, he repeatedly and conveniently stated that he "might not remember" or that he "didn't remember".

The record indicates the reason that Deon stated he "might not remember" or "didn't remember". The following exchange occurred between Deon and his attorney:

Q  Did you talk to me before we started court today?

A  Yes.

Q  Did we talk about telling the truth?

A  Yes.

Q  Did I tell you that it was important to tell the truth?

A  Yes.

Q  Did we talk about the times that you couldn't remember?

A Yes.

Q Did you say to me that you might not remember some things?

A Yes.

Q And did I tell you when it was right to say that you didn't remember?

A Yes.

Q And what did I tell you about saying that you didn't remember?

A That I didn't remember.

We suggest that upon remand the trial court consider these responses of an eight year old child and that he answered the questions as he had been instructed to do so by his attorney.

### (c.) & (d.)

Dion [sic] indicated at times he liked his stepfather when they were having fun.

Dion [sic] also testified that his sister had told him to stop calling their stepfather daddy.

Because the juvenile court judge stated that "no standard exists for review of the recommendations by Master when an issue is presented to a Judge via an exception" we must conclude that he applied no standard to his review in the case *sub judice* and therefore erred, since there is a standard.

## V.

## STANDARD OF REVIEW

It is clear from the master's opinion that her conclusion that the State had failed to prove a prima facie case was premised upon her not believing the children's testimony. When faced with this, the circuit court was bound to review the facts as they were presented before making "his own independent disposition" of them. *Wenger v. Wenger,* 42 Md.App. 596, 604, 402 A.2d 94 (1979). This involves a two-step process. First, the court must look to the facts

and the conclusions reached by the master. Second, the court must make its own judgment of what those facts mean.

In the case *sub judice,* the court's order is devoid of any factual review of the evidence presented before the master; its focus is purely procedural. This is not proper. The factual review of the evidence presented to the master in which we have engaged in this opinion is the type of scrutiny the court should have undertaken. Had it conducted such a review, the court would then have been in the position to exercise its "prerogative of what to make of those facts—the ultimate disposition of the case." *Wenger,* 42 Md.App. at 602, 402 A.2d 94. There is no indication on what the court's decision to defer to the fact-finding of the master was premised, and upon what conclusion of fact it made its own independent determination that there was credible evidence to support the recommendation to dismiss the CINA petitions. Perhaps the court's failure to engage in any factual review can be attributed to its mistaken belief that no standards exist for court review of the recommendations of a master. Nonetheless, our conjecture regarding why the court may have acted as it did does not change our ultimate conclusion that the court acted in error.

In adopting the master's recommendation to dismiss the CINA petitions in the case *sub judice,* the trial court stated:

> No standard exists for the review of recommendations by Masters when an issue is presented to a Judge via an exception. When the question is one of law, clearly the Judge may decide whether that Master has erred. Not so clear is the case as here.

This bald assertion is clearly in error. In *Wenger,* we discussed the proper role of a judge in reviewing the recommendations of a domestic relations master and stated:

> When an appellate court, absent clear error, defers to a trial court, it defers not only to the fact-finding but to any legitimate verdict, disposition or judgment emanating from that fact-finding. The function of the chancellor vis-a-vis the master is quite different. He may, of course,

order *de novo* fact-finding in whole or in part. Where he chooses to rely exclusively upon the report of the master, however, he should defer to the fact-finding of the master where that fact-finding is supported by credible evidence and is not, therefore, clearly erroneous. *The chancellor, however, (unlike the appellate court) always reserves unto himself the prerogative of what to make of those facts—the ultimate disposition of the case.*

*Id.* at 602, 402 A.2d 94 (emphasis added). We went on to point out that:

What must be carefully observed, however, is that the great deference is paid to the fact-finding of the master as opposed to the recommendation of the master. Upon his findings of fact, the master recommends an ultimate disposition. Upon those same findings of fact, the chancellor must make his own independent disposition. *He may be guided by the recommendation of the master but he is no more than guided.*

42 Md.App. at 604, 402 A.2d 94 (footnote omitted; emphasis added).

█ A party excepting to a master's recommendation has the right "to have a review by the [trial judge] of the evidence and testimony taken before the Master, (the first step) [the party has the] right to have the benefit of the [trial court's] judgment, as distinguished from the Master's alone ..." (the second step). *Ellis v. Ellis,* 19 Md.App. 361, 366, 311 A.2d 428 (1973). When reviewing the master's report, it is incumbent upon the juvenile court judge that both of these steps be taken. The report of a juvenile master is reviewed by the trial court on the same basis as that of any other master authorized by the court, except for the added burden placed on a juvenile judge by the special nature of his role.

Although the report of the master is only advisory, the juvenile court judge is required to "give full consideration to it, particularly with respect to the credibility of witnesses, *where the testimony is conflicting".* *Bar Ass'n v.*

*Marshall*, 269 Md. 510, 516, 307 A.2d 677 (1973) (emphasis added). There was no conflicting testimony, as such, in the case *sub judice;* however, the master's report did contain a summary of the testimony and her findings which were the bases for her conclusion that she did not believe either of the children. This conforms with the requirements contained in our holding in *Wenger*, [42 Md.App.] at 608–09, 402 A.2d 94. While the trial court should apply the clearly erroneous standard and thereby defer to the master's fact-finding, it must reserve to itself the decision of what action to take based on those facts, i.e., the ultimate disposition of the case. *Wenger* at 602, 402 A.2d 94. Also, as we said in *Wenger:*

> If the chancellor had no choice but to affirm the recommendation of the master (or his finding of the ultimate, conclusory fact which is distinguishable from the recommendation) unless it was "clearly erroneous," this would be the forbidden delegation of the judicial function. That this may never be done was made clear for this Court by Judge Morton in *Ellis v. Ellis*, 19 Md.App. 361, 365, 311 A.2d 428:
>
>> "Litigants ... in all judicial proceedings, are entitled to have their cause determined ultimately by a duly qualified judge of a court of competent jurisdiction. Md. Const., Art. IV, § 1; MD.Code, Art. 26, § 30; Md.Rule 71a. While the system of resorting to Masters is one of long standing and undoubtedly has salutary effects resulting in the more expeditious dispatch of the judicial process, the system cannot supplant the ultimate role of judges in the judicial process itself."

42 Md.App. 603, 402 A.2d 94.

While the master's findings as to first-level facts—those which answer the What?, Where? and How? questions—are to be given great deference, conclusory or dispositional second-level facts, those which are "indistinguishable from the recommendation" are the province of the juvenile court judge. *Wenger* at 607, 402 A.2d 94.

In the case *sub judice*, the master's first-level of fact-finding included those facts contained in the testimony of the children and her finding that what the children said did not happen. This led her to the second-level at which she made the ultimate conclusion, her recommendation that the petition should be dismissed.

The clearly erroneous standard of review is required as to the first level fact-finding; however, since "[l]itigants ... are entitled to have their cause determined ... by a ... judge ..." the second-level, as we have viewed it, is solely the province of the juvenile court judge and no deference is given to the master's findings at this level.

As to our review of the actions of the juvenile court, former Md.Rule 1086 (new Rule 8-131(b)(2)(c)) [15] provides:

> When an action has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses.

Because in a case, like the one *sub judice* where there has been no judicial determination of the credibility of the witnesses, we are not required to give due regard to the opportunity of the lower court to judge the credibility of the witnesses.

> Where he has not seen and heard the witnesses, the concluding portion of Rule 886 a [16] of the Maryland Rules requiring that due allowance be made for the opportunity of the lower court to judge the credibility of the witnesses is not applicable, and the written testimony is as available to us as to the Chancellor; but the fact that he did not have the witnesses before him does not vitiate the first

---

**15.** Chapters 800 and 1000 were rescinded and re-adopted by the Court of Appeals as new Title 8, effective July 1, 1988.

**16.** New Rule 8-131(b)(2)(c).

portion of that Rule which requires this Court to review a case tried by the court without a jury on both the law and the evidence, and prohibits setting aside the judgment of the lower court on the evidence unless clearly erroneous. *Sewell v. Sewell*, 218 Md. 63, 71, 145 A.2d 422 (1958); *see also Attorney Griev. Comm'n v. Bailey*, 285 Md. 631, 643–44, 403 A.2d 1261 (1979). The juvenile court's affirmation of the master's finding of incredibility was based upon a review of the record made before the master. As the Court observed in *Sewell*, "the written testimony is as available to us as to the Chancellor", 218 Md. at 63, 145 A.2d 422, therefore, what we review on appeal is precisely what the juvenile court judge had before him. Our review, then, would be whether, based on the written testimony, the juvenile court judge was clearly erroneous in adopting the factual findings of the master and whether he erred in adopting her recommendations that the petitions be dismissed. Since the juvenile court judge, in the case *sub judice*, stated that there was no standard, we do not reach that level of appellate review.

## VI.

### THE DISMISSAL BY THE JUVENILE COURT

After a hearing on the exceptions the juvenile court ruled that the children's request for a *de novo* hearing was untimely. As we have held, *supra*, the court was technically correct in its ruling; however, because of the special nature and responsibility of the juvenile court, we hold that in the case *sub judice*, something more was required. The allegations in Danielle's case are about as serious as any that may be made by a child. While Deon's charges are of a less serious nature, the fact that he resided in the same household as Danielle required that his case receive the same level of serious consideration as Danielle's. The proper dispositions of their cases demanded a complete, in depth, investigation and review by the juvenile court. This was not done.

On July 14, 1987, after a hearing and a review of the record, the juvenile court issued an "Order" "affirming" the master's recommendations to dismiss the petitions. We are seriously concerned whether, based on the facts of this case, the judge abused his discretion when he dismissed the petitions without first conducting either a hearing *de novo* or ordering further investigation or both.

Under Rule 911 d the reviewing juvenile court judge is given broad powers:

> d. *Review by Court in Absence of Exceptions.*
>
> In the absence of timely and proper exceptions, the master's proposed findings of fact, conclusions of law and recommendations may be adopted by the court and the proposed or other appropriate orders may be entered based on them. The court may remand the case to the master for further hearing, or may, on its own motion, schedule and conduct a further hearing supplemented by such additional evidence as the court considers relevant and to which the parties raise no objection. Action by the court under this section shall be taken within two days after the expiration of the time for filing exceptions.

Clearly, this section of the Rule anticipates that the juvenile court will review promptly the actions of the master and, even without the filing of exceptions, act in accordance with its mandate as a juvenile court and with all of the power, authority and responsibilities inherent in that mandate. In the case *sub judice,* exceptions were filed and, as a result, the mandate to act was thrust upon the court.

In adopting the master's recommendation to dismiss, the court issued the following order [17]:

> The issue presented by this exception is a request to overrule the Master's decision on the credibility of witnesses. For reasons which will be more fully developed in the course of this order, the Court declines the invitation.

---

[17]. We quote the order in its entirety because it is important that our observations be seen against the backdrop of the content of the order.

Procedurally, Danielle B. (Danielle) and Dion A. (Dion) [sic], siblings, were before the Court on allegations that they are Children in Need of Assistance (CINA) as defined in Section 3–801e, Courts and Judicial Proceedings Article, Annotated Code of Maryland (1984 Replacement Volume): one . . .

"... who requires the assistance of the court because he is mentally handicapped or is not receiving ordinary and proper care and attention, and his parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and his problem ..."

A series of hearings were held by Master Joyce Mitchell to adjudicate the allegations presented by Respondents through the Baltimore City Department of Social Services (DSS). At the conclusion of the DSS presentation of evidence in its case in chief, the mother of both Respondents moved to dismiss. That motion was granted. In the opinion of the Master, neither child was credible. Master Mitchell opined that after viewing the witnesses, hearing them testify and examining their performance before the court, they were sorely lacking. Testimony of the Respondents was also internally conflicting and each Respondent admitted to frequently having told lies to their mother, her husband and others.

To this determination the parties have taken a number of exceptions. In prior rulings the Court has limited the exception to a review of the record. It consists of portions of five (5) reels of tape. These will be preserved and kept available to the parties in case they wish to transcribe them.[1] *In re Keith W.,* —— Md. —— (Vol. 199, No. 7 *The Daily Record* July 9, 1987 p. 8); *In re De-Wayne H.,* 290 Md. 401 [430 A.2d 76] (1981).

That Masters are not judicial officers who exercise no judicial authority has been stated so frequently by the courts as to be axiomatic and not requiring further discussion. The role they play is vital to the effective and efficient operation of the Division for Juvenile Causes of this Court. Each of the eight (8) Masters of this Court

hears literally thousands of cases annually. Witnesses appear before them daily in a multitude of proceedings. When conducting hearings, the classic trial process occurs. Cases are called, witnesses are sworn, testimony is taken, arguments are made and decisions rendered. In nearly every case, just as when a judge is adjudicating a matter, a decision is made and frequently the basis of that decision is credibility. Just simply, "I do not believe a witness" will be the deciding factor of a case. When that occurs, that Master has had the opportunity to see, assess, test and "judge" the credibility of the witness on the basis of demeanor, consistency, recall and capacity.

No standard exists for the review of recommendations by Masters when an issue is presented to a Judge via an exception.[18] When the question is one of law, clearly the Judge may decide whether that Master has erred. Not so clear is the case as here. Rule 911 provides that

"Any party may file exceptions to the Master's proposed findings, conclusions, recommendations or proposed orders ...

"Upon the filing of exceptions, a prompt hearing shall be scheduled on the exceptions ... the hearing shall be limited to those matters to which exceptions have been taken."

Conversely on an identical issue an elaborate procedure is provided as a direction for review of a lower court decision by both the Court of Special Appeals[2] and the Court of Appeals[3]. It should be quickly noted that the situations are readily distinguishable. The procedures established are for review after a judicial determination. Since the Master serves a ministerial function, it is like comparing apples to oranges and yet they are both fruit.

In the situation at bar, this Court will give due deference to the opportunity of the Master to have "judged" the credibility of the witnesses with all the attendant factors. We are not announcing a new policy by stating

18. See our discussion under part V, Standard of Review, p. 31.

this. It is just more of the same. No limitation is proposed, suggested or contemplated in the authority of this Court to exercise its judicial function as specified by statute or rule. We have to recognize some practical facts however. If the Judge is going to review credibility issues, there is no need for the Masters. Encouragement of such a result will provoke calamity in a system that already at times operates on a thin thread. When presented with either a review under Rull [sic] 911a1, an exception under 911c or a sua sponte examination of the proceedings under Rule 911d, this Court will determine those issues that are necessary to a fair and equitable adjudication of the controversy. This will and must be done not in a vacuum oblivious to the realities of the external world. It should be noted, however, that the rights and privileges of all parties will not be subject to the expediency.

Accordingly, it is hereby ORDERED this 14th day of July, 1987 by the Circuit Court for Baltimore City, Division for Juvenile Causes that the exceptions on the record filed herein by the Department of Social Services and Respondents are overruled and the recommendation of Master Mitchell of May 12, 1987 is affirmed, and

it is further ORDERED that all Orders of shelter care issued subsequent to the notices of exception being filed are vacated effective immediately.

[1] Proceedings before Masters are on the record. Rule 910a. The method of recording is an audio reel tape system. Each reel is obtained for use from the Judge and returned after testimony has been recorded. The tapes are kept in the control of the Judge and unless the parties request that the record be preserved, the tape is erased. This act only occurs after three (3) months has elapsed from the last hearing. The tape is then recycled.

[2] See Rule 1085, Rule 1086 and Rule 1087 and the multitude cases cited thereafter.

[3] See Rule 885, Rule 886 and Rule 887 among others.

While we respect the very experienced juvenile court judge and we acknowledge that he may not have meant to say what he said in his order, i.e., that "[n]o standard exists for the review of recommendations by Masters when an

issue is presented to a judge via an exception," the nature of this case is much too serious for us to make any assumptions about what he did mean. Our holding is based on taking his words to mean what they ordinarily mean and that is that there were no standards for him to apply in his review of the recommendations of the master.

The entire order is a discussion of procedure, as the presiding judge saw it. There is no specific reference to the facts of the case, not that this is absolutely necessary in such an order, but, it seems to us, if the court is going to issue an order containing its reasoning in a case of this type it would behoove it to give something more than the technical procedure which it follows. For example, because the master's decision was based on matters that are clearly subject to more than one interpretation, the trial judge should make some evaluation of the master's reasoning. Neither the master nor the trial judge ever mentioned that Danielle was pregnant and suffering from venereal disease, conditions in a thirteen year old child which deserved at least explicit passing mention by the reviewing authorities.

The issue presented by the exceptions was not only whether "the master's decision on the credibility of witnesses" should be overruled but, rather, on the record before the court, whether the master's recommendations that the petitions be dismissed and her implicit finding that Danielle and Deon were not children in need of assistance were to be followed by the court. Because the court said that it would do so, we assume that it did review the record. The court adopted the dismissal recommendation of the master, based on the conclusions of the master that the children's testimony was incredible and that no standard existed for the court's review of the credibility conclusions of the master.

That the master explicitly stated that she did not believe the children is not dispositive, as far as the juvenile court's review is concerned. As we stated, *supra*, it is the duty of the court to review carefully the bases used by the

master, apply the proper standard and then to make its own judgment whether the master's conclusion was correct.

> Judges presiding in disposition hearings for delinquents and neglected/abused children have a different role than their colleagues in adult criminal or civil court. The Family Court judge must know more about human development, family problems, learning difficulties, children's needs, and dispositional alternatives. The Family Court judge must be able to monitor the matching of children's needs with services and to step in when the proposed disposition fails to meet the needs of the child or rehabilitate the delinquent.

Beyer and Urbina, ABA Practice Paper Series, *An Emerging Judicial Role in Family Court* (August 1986). In Maryland, juvenile court judges are given broad statutory authority [19] and the "mandate to act in the best interest of the child provides a broad philosophical scheme for the judge, as opposed to adult criminal or civil court in which the judge is given very specific limits". Beyer and Urbina, *An Emerging Judicial Role* at 39. As a result of their broad discretionary powers, juvenile court judges have the opportunity and indeed the obligation, to act as a monitor in

---

**19.** Section 3–802 of the *Courts* article provides:
(a) The purposes of this subtitle [Juvenile Causes] are:
(1) To provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle; and to provide for a program of treatment, training, and rehabilitation consistent with the child's best interests and the protection of the public interest;
(2) To remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior;
(3) To conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety;
(4) If necessary to remove a child from his home, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents;
(5) To provide judicial procedures for carrying out the provisions of this subtitle.
(b) This subtitle shall be liberally construed to effectuate these purposes.

order to review, order and enforce the delivery of specific services and treatment for children who have been adjudicated CINA. This duty flows from their inherent *parens patriae* jurisdiction.

> The *parens patriae* jurisdiction of circuit courts in this State is well established. The words *"parens patriae,"* meaning "father of the country," refer to the State's sovereign power of guardianship over minors and other persons under disability. *See* 67 A C.J.S. *Parens Patriae,* at 159 (1978); Black's Law Dictionary 1003 (5th ed. 1979). It is a fundamental common law concept that the jurisdiction of courts of equity over such persons is plenary so as to afford whatever relief may be necessary to protect the individual's best interests. *See* 27 Am.Jur. 2d *Equity* § 69 (1966); 39 Am.Jur.2d *Guardian and Ward* §§ 9, 61 (1968); 59 Am.Jur.2d *Parent and Child* § 9 (1971). Maryland cases are generally in accord. *See Taylor v. Taylor,* 246 Md. 616, 229 A.2d 131 (1967); *Stirn v. Stirn,* 183 Md. 59, 36 A.2d 695 (1944); *Barnard v. Godfrey,* 157 Md. 264, 145 A. 614 (1929); *Jenkins v. Whyte,* 62 Md. 427 (1884); *Ellis v. Ellis,* 19 Md.App. 361, 311 A.2d 428 (1973).

*Wentzel v. Montgomery Gen. Hosp.,* 293 Md. 685, 702, 447 A.2d 1244 (1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 790, 74 L.Ed.2d 995 (1983).

As Chief Judge Gilbert pointed out for this Court:

> The court of equity "stands as a guardian of all children, and may interfere at any time and in any way to protect and advance their welfare and interests."

*Montgomery County v. Sanders,* 38 Md.App. at 418, 381 A.2d 1154 (quoting *In Re Bort,* 25 Kan. 308, 310, 37 Am.Rep. 255, 257 (1881)). The duties of a juvenile court judge are very broad and pervasive.[20]

---

**20.** For a limited review of the development of judicial authority in juvenile matters see *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Wiggins v. State,* 275 Md. 689, 344 A.2d 80 (1975); *Ross v. Pick,* 199 Md. 341, 86 A.2d 463 (1952); *Montgomery*

We hold that the juvenile court judge erred when he concluded that there was no standard for review of the master's findings. We reverse and remand so that the proper standard may be applied.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE–MOTHER.

*County v. Sanders,* 38 Md.App. 406, 381 A.2d 1154 (1978); *In re Spence,* 41 Eng.Rep. 937 (Ch. 1847); *Wellesly v. Beaufort,* 38 Eng.Rep. 236 (Ch. 1827); *Falkland v. Bertie,* 23 Eng.Rep. 814 (Ch. 1696); 1916 Laws of Maryland, chs. 326, 674, ABA Judicial Administration Division Handbook, *The Improvement of the Administration of Justice,* at 222 (6th ed.1981), Areen, Intervention Between Parent and Child: *A Reappraisal of the State's Role in Child Neglect and Abuse Cases,* 63 Geo.L.J. 887 (1975) and *Report of the Maryland Commission on Juvenile Delinquency* (1943).