78 A.3d 500

**In re PRISCILLA B.**

**No. 349, Sept. Term, 2013.**

Court of Special Appeals of Maryland.

Oct. 30, 2013.

602

Tamara D. Sanders (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Leslie K. Ridgeway (Douglas F. Gansler, Atty. Gen., on the brief, Baltimore, MD) David C. Wright (Child Advocacy Project Eastern Shore, on the brief, Chestertown, MD), for appellee.

Panel: WRIGHT, NAZARIAN, ARRIE W. DAVIS (Retired, Specially Assigned), JJ.

NAZARIAN, J.

George B. ("Father"), the father of six-year-old Priscilla B., appeals the Order of the Circuit Court for Worcester County that found Priscilla a child in need of assistance ("CINA") for the third time. The circuit court affirmed the recommendation of a master who found, after a hearing, that Priscilla's mother, Christina F. ("Mother"), and Father neglected Priscilla by failing to provide her with an emotionally or physically safe environment. The court also granted temporary shared custody to Priscilla's maternal grandmother and a couple who was caring for Priscilla at that time (and had in the past). Father appeals that order, Mother does not. Because we find no error in the master's and the circuit court's conclusions that Priscilla was properly found a CINA, removed from the home, and placed in temporary shared custody, we affirm.

## I. BACKGROUND

Mother, Father and (until she was removed) Priscilla live in Berlin, Maryland, in a trailer that the record reveals (without dispute) is dirty and badly in need of repair. The setting by itself doesn't, and shouldn't, give rise to CINA proceedings—poverty does *not* render parents unfit or children unsafe. But this family's living conditions deteriorated to the point that in late September 2012, a child protective services investigator, Tammy Jones, investigated the home based on allegations of neglect: Priscilla had lost weight, lived in an environment that involved continued domestic violence and alcohol and drug abuse, had been left home alone under the "supervision" of the family dog, and had medical needs that were left unmet. Based on these allegations, and in part due to the family's history with the Worcester County Department of Social Services ("DSS"), Ms. Jones investigated further.

### A. Prior DSS Involvement And CINA Proceeding.

DSS knew this family well, and long before the events giving rise to this case. Priscilla tested positive for the presence of cocaine when she was born in 2006. Under the CINA statute, this test result gave rise to a year-long pre-

sumption that she was "not receiving proper care from [her] mother" and fell within the definition of a CINA. Md.Code (1974, 2013 Repl.Vol.), § 3–818(1) of the Courts & Judicial Proceedings Article ("CJ"). Although her case was closed in July 2007, as Ms. Jones detailed in a Court Report to the master in this case, DSS was only briefly out of Priscilla's life,[1] and reentered it in October 2010 after complaints that Mother and Father had continuing problems with domestic violence, drug and alcohol abuse and housing issues that gave rise to a new DSS investigation.[2] The month before, police had responded to an early morning call alleging a domestic dispute and found both parties heavily intoxicated, with Father having locked Mother out of the house. The condition of the house presaged its state in the current proceeding: DSS found a hole in the middle of a bedroom floor, broken windows, a yard cluttered with trash and dangerous debris, and no food in the home. At that time Priscilla and Father shared a couch to sleep because Mother took over the bedroom when she was drunk. These findings led to a proceeding in which Priscilla was found (for the second time) to be a CINA. For reasons that are not apparent from this record, the case was closed on April 23, 2012. Notably, though, the DSS investigation remained open, and only five months passed before intervention became necessary once again.

---

**1.** Ms. Jones detailed in the Court Report to the master Priscilla's status as a CINA from October 2010 through April 2012, in addition to five prior instances of "unsubstantiated" neglect. One of these dates, May 21, 2004, preceded Priscilla's birth and presumably related to Mother's other daughter, who was sixteen at the time of the hearing and had been raised since she was two by Mother's mother.

**2.** This information appeared in an Addendum to the Court Report introduced in the course of Ms. Jones's testimony. Counsel for Mother and Father objected to the Report's admission to the extent that it contained hearsay statements, but the master admitted the document into evidence. Counsel for DSS clarified that as to the history prepared in conjunction with Ms. Jones's report, "the other matters that are in [the] report or matters [she] testified to today are available to respond to today." Counsel for Father asked no questions of Ms. Jones regarding the report during his cross-examination, which spanned only two-and-a-half pages.

## B. Current Allegations And Investigation.

Ms. Jones began investigating the allegations giving rise to this case in September 2012. She met first with Priscilla at her school, then went to the home to meet with Mother and Father. At the December 7, 2012 hearing before the master (the "Hearing"), Ms. Jones recounted Father's immediate hostility upon her arrival, as well as the unsafe conditions she found in the home:

[A]t the home [Father] met me outside and I discussed with him the referral allegations and he was immediately argumentative and became belligerent and denied all of the allegations, and then I asked to see the inside of the home. And I went inside of the home which was very dark. The flooring that I walked on through the entryway of the home and the living room and the hallway leading down to the bedrooms, it moved, like there was holes in the floor. Some of those holes were covered with just a carpet and I addressed that with [Father]. I said, you know, the floor is moving, like I was fearful that I was going to fall through the floor. And he said all floors move. And so then we walked through the hallway and that floor was the same way, back to Priscilla's bedroom, and I observed that there was a mattress on the floor and that's where Priscilla slept. And I asked why the mattress was on the floor and [Father] said that it was more comfortable. And I asked if it was more comfortable for Priscilla or for [Father] and he said it was more comfortable, those were his words. So [Father] was very argumentative while I was inside of the home. [Mother] was there, she was emotional, not as argumentative or belligerent as [Father], but *I didn't feel safe being inside the home* so we went back outside, continued conversation with [Father]. Both he and [Mother] stated that they didn't understand why I was at the home, they didn't understand the allegations....

... In addition to the flooring it was unkempt. The kitchen area was dirty, the refrigerator and freezer were very dirty, it was very cluttered, a lot of items that I don't know what they were were lying all around. So I explained to them

when I was outside that *it was my assessment that the
home,* the living environment *was not safe for Priscilla* and
I asked them to make a plan for Priscilla until we could
have a family involvement meeting.

(Emphasis added.)

Based on that visit, Ms. Jones determined that Priscilla
should be removed from the home because "the home environ-
ment was not safe" for her. The parents suggested two
resources for potential placements: Priscilla's maternal grand-
mother ("Grandmother") and friends of Grandmother through
her church who had helped care for Priscilla in the past (whom
we refer to as the "Caregivers," and the mother individually as
"Carol P."). Ms. Jones held a "family involvement meeting"
shortly after the investigation, and the parties agreed on a
plan for Priscilla's care. Father agreed to fix the flooring in
the trailer. The parents were required to go to couples
counseling, and DSS recommended that each undergo sub-
stance abuse counseling and drug evaluations.

Ms. Jones also investigated allegations that Priscilla's par-
ents had allowed a spider bite on Priscilla's leg (which, even
Father agreed, she received at home, and that ultimately
required medical attention and antibiotics) to go untreated.
Grandmother testified that she had noticed the wound on
Priscilla's leg, which was obviously infected; she took Priscilla
to the doctor, who confirmed the diagnosis. Grandmother
received antibiotics to treat the wound and told Mother and
Father to administer the medication to Priscilla regularly.
Grandmother left town and returned a few days later to
discover that Priscilla's parents had not given her the medi-
cation regularly. Indeed, Grandmother testified that she has
always had to be responsible for getting medical care for
Priscilla.

Grandmother also took a dim view of her son-in-law's and
daughter's parenting skills. According to her testimony, they
fought when Priscilla was with them "maybe 80 percent of the
time at least." She testified about her own run-in with Father
shortly after Priscilla went to live with the Caregivers, when

Grandmother took her back to her parents for a visit: "when I took her over they met me on the porch and that's when I said she wasn't supposed to stay there and he got right up in my face and he said she's my daughter and she'll stay here." She testified that she saw Father drink alcohol with Priscilla around at gatherings at the home. And when asked about her relationship with Mother and Father, she responded, "With my daughter, I love my daughter very much, but I don't like her. [Father,] no comment."

Carol P. contrasted Priscilla's environment before removal with the environment at her home, where Priscilla lived at the time of the hearing with her and her husband and their three children. She had watched Priscilla at various times since she was four years old. Carol P. testified that in the summer of 2012, Mother called her at about 6:30 in the morning in the midst of a fight with Father. Mother was hiding in a camper behind their trailer with her older daughter, and had called the police. As Carol P. put it, Mother was distraught and afraid, and told her that Mother and Father "were fighting and arguing and that if something happens I have to fight for [Priscilla]." Carol P. testified that she had not seen Mother and Father drink alcohol around Priscilla, but had seen empty beer cans and beer containers in the yard.

Carol P. also described an event that left Priscilla extremely upset. After she had been removed from her parents' care, the Caregivers went away for a weekend and Priscilla stayed with Grandmother. Mother had told Priscilla she would bring donuts to Grandmother's house and they would carve a pumpkin:

> So Priscilla got up the next morning at 8:00 in the morning and she was like I don't want to eat breakfast here. I [want] to go over and eat breakfast with my mom and grandmom, and my mom's bringing me donuts. Well, I think we called about eight or ten times that morning and they did pick the phone up and we took her over to [Grandmother]'s house and I believe [Grandmother] told me that it was between . . . 1:00 and 2:00 that [Mother] came over, did not have the donuts. And I know that seems

insignificant, but to a child that's important. And they didn't carve the pumpkin, they painted the pumpkin.

Carol P. painted a picture of Priscilla as an agitated, unsettled child when she came back from a visit with her parents, in marked contrast to the creature of habit she had become when living with the Caregivers:

Well, particularly this last time she was very, very active and she had been given caffeine. And ... with us she's on a schedule, you know, and she knows what to expect; she knows when to expect her breakfast, she knows when to expect her dinner, she knows when there's bath and there's homework time because she is on a set schedule. I have three other children. And *when she comes back she's*—she comes back different, she's antsy and ... I would describe as a child that is ... *just very edgy and just not herself. When she's at our home* she's just like one of our children and she just—she plays and *she doesn't worry about things.*

(Emphasis added.) Carol P. explained that according to Priscilla's teachers, she is doing well in school; although she is a grade level behind, she is starting to learn to read, understands phonics and sounds out words, and is doing well in math.

Carol P. was amenable to having joint custody of Priscilla "[b]ecause she's been in our home and she's been in our life and she's part of our family." She expressed no such sentiments when asked about Priscilla returning to Mother and Father:

Q. How do you feel about returning her to her parents?

A. Scared for Priscilla, scared that she won't be safe there, scared because of the things that she tells me and things that I've observed and things that I've seen.

Q. Well, you haven't seen any injuries to her from her home, have you?

A. No, but she's been to my home where her hair's been matted, dirt underneath her toenails, and I asked her when she's gotten a bath and she said it's been a while. I've seen her—

Q. You don't like [Mother], do you?

A. No, I like [Mother].

Q. You do?

A. And I like [Father], but I have to care for Priscilla's safety, and Priscilla, I look at Priscilla as a child that needs help and needs somebody that's going to take care of her and that's going to meet her needs and help her to grow and be the person that she can be.

Viola Williams, a case work specialist with the In–Home Family Services Unit of DSS who had been the case worker for the family in the prior CINA hearing, testified at the Hearing that Priscilla's appearance and demeanor had improved since she began living with the Caregivers:

A. She is very close to [the Caregivers] and their children, the family members that are in the home. She enjoys spending time with them, she's learning different things, she's on more of a schedule since she's been there with them and she looks happy. Her overall general, she is very happy being there with them.

Q. How about her appearance, have you noticed any changes in her appearance since she's been residing with the [Caregivers]?

A. Yes, she—her overall appearance, she—I'm not sure if I have the word [for] this, but she looks different to me, very, very appropriate.

Q. How about her hygiene, do you notice a difference now in her hygiene?

A. Well, her hygiene was clean, but she just appears to look different this time, I'm not sure.

Q. Like how?

A. Her dress was different, her hair was different, she just—her overall appearance just looks a lot I want to say cleaner.

When Priscilla returned home after that case was closed in April 2012, the trailer was (according to Ms. Williams) "appropriate and safe." When she saw it again in September, however, there was "more debris" on the outside and the house needed repairs on the interior.

Father testified at the Hearing, and his testimony was entirely consistent with other witnesses' characterizations of him as belligerent and hostile. He admitted to drinking alcohol "[w]henever I feel like it," but denied drinking in excess, claiming to drink two to three beers three or four times a week, and only "very rarely" in front of Priscilla. He denied arguing in front of Priscilla, and claimed that until Priscilla was taken away, domestic violence was not a problem and things "were going very well" between him and Mother—he seemed to blame any conflict between him and Mother on the fact that Priscilla had been removed from the home. He disagreed with all the allegations about violence or arguing in the home, not feeding Priscilla, and about medical neglect. He stated that he "never even knew" she had a spider bite. He described the condition of their home in September 2012—when Priscilla was removed based in part on Ms. Brown's conclusion that she did not feel safe carrying on a conversation with Father inside it—as "a little dirty," but "not unlivable or unsafe at all." When asked the condition of Priscilla's bedroom, he simply responded, "[h]er bedroom's fine." When asked if he felt his home was safe for Priscilla, he asserted, "Yes, *my home was never not safe for my child.*" (Emphasis added.)

Father was also asked (without objection by his counsel) about Priscilla's prior CINA case. He conceded that Priscilla was adjudicated a CINA in that case, but admitted only that "it was proven that we didn't get along because the cops were called."

Although Mother was present at the hearing, she did not testify.

## C. Disposition/Adjudication By The Master.

After hearing the testimony of the parties, the master began by addressing the credibility of the parties, including reference to the prior CINA proceeding:

[Mother and Father] have a history with this Court. Like it or not there have been ongoing investigations and involve-

ment of [DSS] and this Court with this family since 2007. There have been various and sundry run-ins with the Court in other venues, criminal court, traffic court, ongoing for years, for years. Both [Mother] and [Father] have piles and piles of paperwork indicating that they have run into issues, both criminally with regard to traffic, with regard to domestic violence, and with regard to the care of Priscilla. *I mean to say right from the get-go that although I allowed a lot of hearsay in this, I did not rely on it, and I'll tell you why, I felt like I had enough other evidence.* I'm not sure, quite frankly, that Priscilla's statements offered through other people were anything but hearsay.

(Emphasis added.)

Having declined to consider Priscilla's statements, the master then went through Ms. Williams's testimony, noting particularly her belief that Priscilla didn't feel safe:

But you can't listen to the totality of the evidence offered *in this case by the witnesses* and not come up with the conclusion that *this child doesn't feel okay in her mom and dad's home,* and that is absolutely developmentally inappropriate. . . .

(Emphasis added.) After reviewing the remaining evidence, the master cited numerous factors that contributed to her recommendation: Ms. Williams's testimony regarding the unsafe condition of the home and the difference in Priscilla's appearance upon going to stay with the Caregivers; the parents' history of (and Father's refusal to abstain from) drinking alcohol; Grandmother's care for Priscilla after the spider bite became infected; and Carol P.'s testimony about Priscilla being agitated after returning from visits to her parents' house. She then stressed the importance of the family's history; although she discussed the prior CINA petition, the master was careful to point out that the outcome of the prior case was not the basis for her decision in the current case, in which DSS presented independent evidence of neglect:

I heard your case from start to finish when it was opened in October of 2010, and [counsel] said it really well, it was a

happy day when Priscilla went home. The concerns that are alleged today are the exact concerns that were alleged back in October of 2010 when the case came before us on a shelter care, same concerns. *And although that can't be the finding in and of itself for a CINA finding today I find that the totality of the evidence before the Court today* based on parties' history, based upon a six-year-old's position of being—of feeling unsafe, based on the fact that she's six and she can't self-protect, *based on all of the above I find that the allegations in the petition are sustained* as to: one, the allegation of ongoing domestic violence; two, allegations of unsafe and unhygienic conditions of the house; three, allegations that Priscilla's medical needs may not have been properly met. I cannot find and I will make a statement about this, that she was left unattended or that she was not properly fed, I do not believe the evidence supports that. Nevertheless, I find that most of the evidence in the petition as alleged were sustained. Forty plus months of services for this couple. I think [DSS] made reasonable efforts, [counsel for Mother], there was a slew of them.

(Emphasis added.)

After adjudicating Priscilla a CINA, the master then found that Mother and Father could not "put her needs first" and were "unwilling to give proper care and attention," and therefore that it was "contrary to her welfare to return home at this stage." The master again cited numerous bases for that decision: (1) the current state of the house was unknown; (2) it was likewise unknown whether the parents were remaining sober; (3) there were ongoing concerns of potential maltreatment; and (4) DSS had made reasonable efforts to provide services to the parents. The master recommended shared joint custody between the Caregivers and Grandmother until a subsequent hearing.

### D. Circuit Court Review.

Father and Mother filed joint exceptions to the Master's Report and Recommendation, and initially requested a trial *de*

*novo.* They later agreed to submit their exceptions on an agreed redacted version of the record, without a hearing; the redactions eliminated portions of the record considered by counsel to be hearsay statements. The main purpose of this agreement was to exclude any statements by Priscilla to Ms. Jones, but there was more to it than that. The circuit court took pains to clarify that while it was not entirely clear from the transcript how any hearsay within the DSS reports was to be treated (because counsel did not actually redact any part of those reports except Mother and Father's names), it ultimately did not consider any hearsay included in those reports in its decision:

> And what [I] reviewed then was the transcript as well as the contents of the court file, the exhibits which were entered into evidence at the hearing, and the reports that were entered into evidence at the hearing. When they were introduced counsel took or noted their objection to the hearsay that may have been contained or that was contained in those reports and that was noted by [the master] and the exhibits were admitted. In the spirit of the redacted transcript, however, *I'm not sure how they were admitted, whether her intent was to exclude the hearsay or not consider the hearsay that was included in those reports.* They were simply admitted. But again, *in the spirit of the parties' agreement as to what the Court was going to review, those exhibits are entered into evidence, however, the hearsay which was included, that was not considered* because I think that was the parties' agreement and that's the way that we'll proceed here today.

(Emphasis added.) The court adopted the "first level facts" from the master, as supported by the evidence and not clearly erroneous. The court then looked at whether the facts were "sustained by a preponderance of the evidence for the purposes of adjudication." The court noted the master's prior involvement with the family and stated that "she was in an excellent position to gauge the credibility of these witnesses and the reliability of their testimony." And then the court

detailed the importance of the context in which Priscilla's case arose:

> There is no doubt a history with the Court and that is outlined in the record, in the court report, most particularly and most importantly the CINA case that was previously mentioned, that's acknowledged by all of the parties. And in that case it's significant because the issues which were established, because there was an adjudication and there was a disposition of CINA, concerned many of the same allegations, general allegations, and those are alcohol and substance abuse as well as domestic violence, condition of the home. And those are relevant in that *all allegations need to be evaluated and considered in some type of a context, they can't be considered in a vacuum. ... So the prior involvement certainly is of relevance to this*—was of relevance to the Master and is of relevance to this Court in exercising its independent judgment.

(Emphasis added.) The court recounted at length the testimony of the parties and the findings of the master. We reproduce the remainder of his opinion relating to the CINA adjudication because Father's appeal turns largely on his views of what the circuit court did and did not rely on:

> [The master's] important finding ... [considering] the ... independent evidence [was] that this child does not feel safe in the home of the parents. And her observation or her finding from that is that it was absolutely developmentally inappropriate for this child and this lack of security, in addition to being inappropriate, is detrimental and damaging to the child on a short term as well as a long term basis. I think that's absolutely clear, I'm satisfied of that.
>
> The notion that was expressed that she wanted to be with the [Caregivers] who have become somewhat of her *de facto* parents over a significant length of time because they—the facts show that the child was placed with maternal grandmother, maternal grandmother had a heavy work schedule and then had some type of an injury, I believe she said she had shattered her foot and was off her feet for an extended period of time, knew the [Caregivers] through church, the

[Caregivers] volunteered to take care of Priscilla and lived at least at that first go-around as I recall for about a three-month period, an extended period of time. And since then they've had an ever present role in young Priscilla's life.

But the notion that she wants to be with the [Caregivers] solely because of material things was not persuasive to the Master, not persuasive to this Court today. I think the Master noted and I agree that [to] a child of this age, material items are fleeting. She's with them because she's looking for a safe and secure bond which fortunately for her she has found with the [Caregivers]. Certainly everybody acknowledges that there is a bond and a loving relationship with the parents as well, but it's the safety issue and safe and secure bond that she's looking for like all children of this age. And I'm quite satisfied if she had her druthers she'd rather be living with the parents, but the safety issue is what is paramount for her. It's not a conscious decision on her part or one that comes from considered judgment necessarily, it's one that just flows naturally from a child, especially a child of this age.

The factors that were considered down below were the condition of the home, the dirty—the fact that the house was noted to be dirty, cluttered, and there was debris both inside and outside and there [were] some concerns about structural safety of the house. Now, there's no question that many of these issues have been addressed or partially addressed by [Father].... But there was nothing below of a definitive nature as to whether or not all of these issues have been addressed such that the home is safe now. Obviously [Father] contends that it is, but there was testimony from both of the workers that prior to adjudication in this matter with the Master that it wasn't and that came in large part from [Ms. Williams.]

\* \* \*

[Ms. Williams] has and enjoys a good relationship, it's very obvious with the parents; they requested that she be assigned to the case and her testimony was that the house, although there has been progress made, is not quite there

yet. The appearance of the child, much everyone agreed, or I should say the independent witnesses agreed, Ms. Williams, [Carol P.], Ms. Jones, and Grandmother agreed that the appearance of the child is much more appropriate, cleaner, happier. And this is contrasted with the testimony of [Carol P.] who testified that often when [Priscilla] came from a stay with the parents that her hair was matted, dirty, and unbathed for periods of time, edgy, anxious, asking many questions, repeating herself. And this is indicative of that insecurity, and her testimony I found to be compelling and persuasive: when she comes back, what are we going to do? What's the plan? Are we going to take care of this? And it's indicative of an angst and an insecurity when she returns, and then eventually that calms and mellows out. And I think this speaks to what I spoke—what [the master] spoke to and what I spoke to at the outset about this lack of security, lack of a bond.

The prior cases were generated in large part by substance abuse, alcohol abuse, and domestic violence and that was prevalent in the home. And the record is quite clear that that was the primary cause of the prior CINA case and continued DSS involvement. So we start with that prior history and then we look at the testimony that came at the last hearing and it's quite clear that the alcohol issues that permeate this household and created the problems, the insecurity, instability for Priscilla continue, they're unresolved. And there was much made about whether there was sufficient evidence, specific instances of alcohol abuse, and those concerns are noted. But given the history and given the lack of any progress by the parents in this regard and lip service doesn't cut it as far as this Court's concerned. There's been nothing meaningful as far as progress goes in this alcohol regard. [Father] had been ordered to abstain from alcohol in the past; as noted by the Master, he hasn't, his attitude is when asked if he drinks, the quote I wrote down is "I'll drink whenever I feel like it." It's not indicative of any meaningful progress in relation to a recognized problem.

She was asked, there was some testimony concerning when Ms. Williams gave [Father] a referral or the parties a referral to the health department and she acknowledged, once again, always very candid and straightforward that the actual referral had been provided to them that day, the day of court. However, Ms. Jones was very clear, although she didn't remember the exact date, she remembered that a referral had been provided, the parties said that they would follow through and they didn't. And to me that's—based on the history that's true to form for the parties as it relates to their lack of progress. So there's no doubt based on the history and based on the testimony on that day that this problem of alcohol abuse in the home and its damage to the child is unresolved and it continues.

[Carol P.] noted that on occasion when she was over at the house there were beer bottles strewn about the yard and I know that that in and of itself does not meet the burden, but when we look at the totality of the circumstances, the existing problem, the lack of progress, and the allegations that were made, the Court is concerned with the continued alcohol abuse in the home and the damage, the potential damage to Priscilla.

The domestic violence, again, there's a history here. [Grandmother] testified that the instance of arguing, confrontations in front of the child she said were about 80 percent of the time. She did speak of one specific instance on the porch when she got into a verbal confrontation with [Father] in front of the child. [Carol P.] spoke of a frantic call from [Mother] where she was hiding in a camper on the property to protect herself or hide from [Father]. And [Father] testified that there's been no domestic violence since the first CINA case ended in April of 2012, but [Carol P.'s] uncontradicted testimony was that this, in fact, had happened in the summer of 2012. Ms. Jones spoke of a recent report of domestic violence. Again, not sure of the exact date, but she did characterize it as recent. And the Court is satisfied this is an ongoing problem in that home, that it is detrimental to Priscilla.

On the issue of medical neglect, again, there are, and we've all seen much more serious cases of alleged medical neglect than that which was alleged here concerning the spider bite, that's for sure. It ties in though with the condition of the home; there were allegations about the condition of the home being dirty, cluttered, debris both in and out. She's bit by a spider, [Father] testified that that happened in the home. He didn't notice it, [Mother] didn't notice it, it was noticed by [Grandmother], it was handled by [Grandmother]. What was interesting about her testimony was that was just kind of an automatic for her because she said that based on history with these two parents she knew that the issue wouldn't be handled so she took it upon herself to take the child in for medical attention, got the prescription. And again, we have a divergence of testimony here as to whether or not the antibiotics were followed through with, but [Grandmother] enjoyed credibility below and enjoys it here today based on a review of the testimony. And her testimony is quite clear that the ... course of antibiotics was not followed through with, that's what [the master] found and I so find as well.

So are there worse cases of medical neglect? Most definitely. Was there a shortcoming here on the part of the parents that posed a serious threat to the child? Yes. Condition of the home, we've already spoken about that.

There was one other incident that was testified to by [Carol P.] which, again, may not seem like a huge deal and [the master] didn't mention this, [Carol P.] attached great significance to it in her testimony and I think she was justified in doing so and this was the instance, I guess it must have been around Halloween when [Mother] said that she was going to pick the child up or she was going to meet the child the next morning, bring donuts, and they were going to carve the pumpkin, and the child apparently woke up and was anxious to be picked up and get with [Grandmother], and her mom and have donuts and carve the pumpkin, and [Mother] was a no show until late in the day.

And those type of things are—which may seem a result of our busy schedules, but it seems to be something that based on the testimony is a recurring theme, and I can't tell you how damaging something like that is potentially to or is to a child because we know the significance of these bonds, these bonds where children feel secure with a caregiver, come to rely on that caregiver. And things like that, although it may be something that's not that significant to the caregiver is very important and very significant and potentially damaging to the child. And that's what [Carol P.'s] point was and I think that point is well taken and it's not an isolated incident based on the testimony.

Another thing that the testimony showed was an educational shortcoming that has been addressed and rectified or is in the process of being rectified to get Priscilla up to speed as it relates to her schooling. The testimony was that she's about a year behind and she wasn't able to read coming into her first grade year and apparently that issue has been addressed. So there's a potential for—in addition to the other factors, and this is just noted by the Court, there's a potential that there was a lack of attention paid to her educational needs. I acknowledge that the testimony was uncontradicted that [Father] did spend time with his daughter doing her homework, however, there was this shortcoming here that apparently has been bridged and that warrants additional follow-up by the Department certainly.

So when we look at the totality of the circumstances taken in a singular—if we view those instances in a vacuum; in other words, the medical neglect, the condition of the home, the alcohol abuse, the domestic violence, taken alone they probably aren't enough to constitute the requisite finding, constitute a factual basis for a finding of neglect. But taken together in the context of history the Court is satisfied after exercising its independent judgment that the facts alleged in the petition, the CINA petition, were sustained below, and the Court denies the exceptions as it relates to the adjudication, adopts the findings of the Master as its own and concludes by a preponderance of the evidence that the

allegations alleged have been sustained and that there was a showing of neglect. And the Court so finds and also finds that the parents have neglected the child, Priscilla, and are unable and unwilling to give proper care and attention. The court went on to address, and affirm, the Master's disposition of the case, and found that it was "contrary to the best interest [of Priscilla] to be returned home." The court further concluded that DSS had "made reasonable efforts to avoid removal" of Priscilla, including family involvement, Father's agreement to participate in ongoing services (both for substance abuse and domestic violence), along with services in the course of, and even after the closure of, the second CINA proceeding.

Father filed a timely Notice of Appeal. Mother did not.

## II. DISCUSSION

■ Neglectful behavior toward a child may seem more passive in character, but a child can be harmed as severely by a failure to tend to her needs as by affirmative abuse. In determining whether a child has been neglected, a court may and must look at the totality of the circumstances, as the court did here, see In re Dustin T., 93 Md.App. 726, 735, 614 A.2d 999 (1992), and must find the child a CINA by a preponderance of the evidence. See CJ § 3–817(c). Reviewed in the light of the parties' history with DSS and the present, ongoing and specific neglect found by the circuit court, we hold that the court's decision to find Priscilla a CINA (again) and to place her in the temporary care of Grandmother and the Caregivers was entirely appropriate and well within the court's discretion. To put that decision in context, we start with the relevant parts of the CINA statute and the process by which the courts interpret and implement them.

### A. Statutory Framework, Judicial Standards Of Review, And The Parties' Contentions Below.

■ When a caregiver can't tend properly to a child's needs, she may be deemed a CINA in several different contexts:

(f) "Child in need of assistance" means a child who requires court intervention because: (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and

(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

CJ § 3–801(f). The statute provides a more specific definition for "neglect":

(s) "Neglect" means the leaving of a child unattended or other failure to give proper care and attention to a child by any parent or individual who has permanent or temporary care or custody or responsibility for supervision of the child under circumstances that indicate:

(1) That the child's health or welfare is harmed or placed at substantial risk of harm; or (2) That the child has suffered mental injury or been placed at substantial risk of mental injury.

CJ § 3–801(s). The purpose of CINA proceedings is "to protect children and promote their best interests." *In re Rachel T.*, 77 Md.App. 20, 28, 549 A.2d 27 (1988). The burden of proof here, a preponderance of the evidence, is lower than the burden the State bears when seeking to terminate parental rights, where the "much more drastic and permanent interference" justifies the higher burden of proof of clear and convincing evidence. *In re Colin R.*, 63 Md.App. 684, 697, 493 A.2d 1083 (1985); *see also* Md.Code (1984, 2006 Repl.Vol.), § 5–313 of the Family Law Article ("FL").

 A CINA petition wends its way through not just any court, but through juvenile courts, which provide a special setting for decisions relating to the needs of vulnerable children:

Judges presiding in disposition hearings for delinquents and neglected/abused children have a different role than their colleagues in adult criminal or civil court. The Family Court judge must know more about human development, family problems, learning difficulties, children's needs, and dispositional alternatives. The Family Court judge must be

able to monitor the matching of children's needs with services and to step in when the proposed disposition fails to meet the needs of the child or rehabilitate the delinquent. *In re Danielle B.*, 78 Md.App. 41, 68, 552 A.2d 570 (1989) (quoting Margaret Beyer & Ricardo Urbina, An Emerging Judicial Role in Family Court, ABA Practice Series (August 1986)). We elaborated in *Danielle B.* that "[a]s a result of their broad discretionary powers, juvenile court judges have the opportunity and indeed the obligation, to act as a monitor in order to review, order and enforce the delivery of specific services and treatment for children who have been adjudicated CINA." *Id.* at 68–69, 552 A.2d 570. Simply put, "[t]he duties of a juvenile court judge are very broad and pervasive." *id.* at 69, 552 A.2d 570 (footnote omitted).

Before *Danielle B.*, we had explained the supporting role that masters play when they are the first level within the judiciary to review a CINA proceeding, and that

> much laborious and time-consuming fact-finding has traditionally been carried out in the equity courts by masters.... In recognition of this valuable function, our case law is replete with statements about the deference that will be paid to the findings of fact by the master, who heard the witnesses and observed their demeanor, unless such fact-finding is clearly erroneous.

*Wenger v. Wenger*, 42 Md.App. 596, 603–04, 402 A.2d 94 (1979). This deference does not extend, however, to every aspect of the case:

> [w]hat must be carefully observed ... is that the great deference is paid to *the fact-finding* of the master as opposed to the *recommendation* of the master. Upon his findings of fact, the master recommends an ultimate disposition. Upon those same findings of fact, the chancellor must make his own independent disposition. He may be guided by the recommendation of the master but he is no more than guided.

*Id.* at 604–05, 402 A.2d 94 (emphasis added) (footnote omitted).

The "first-level" findings of fact (regarding witness credibility and the like) made by the master are reviewed in turn by

the circuit court (and then an appellate court) under a clearly erroneous standard. Second-level facts are different, and are viewed as "conclusory or dispositional" facts, *id.* at 607, 402 A.2d 94, to which the circuit court need not give as much deference. This yields for us a blended standard of review:

> When the appellate court scrutinizes factual findings, the clearly erroneous standard ... applies. [Secondly,] [i]f it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion.

*In re Yve S.*, 373 Md. 551, 586, 819 A.2d 1030 (2003) (brackets in original) (emphasis and citations omitted) (quoting *Davis v. Davis*, 280 Md. 119, 125–26, 372 A.2d 231 (1977)).

Stated broadly,[3] Father argues that the circuit court erred in finding Priscilla neglected and a CINA, and further that it erred in its disposition by allowing Priscilla to stay with Grandmother and the Caregivers, because it reached erroneous conclusions about Father's credibility vis-a-vis that of other witnesses. We review these contentions for clear error. Beyond that, he argues that both the master and the circuit court improperly considered his past incidents of domestic violence and alcohol and substance abuse when, according to him, there was no evidence properly before them relating to that prior behavior. It is hardly surprising that DSS and Priscilla's best-interests attorney disagree and argue that the circuit court made the right call.

---

3. As Father stated the questions presented there are two:
 1. Did the juvenile court err in determining that Priscilla was neglected and a child in need of assistance?
 2. Did the court err by placing Priscilla outside of the custody of her natural parents?

Father's effort to narrow the historical context is a leitmotif that runs throughout his appeal. As a practical and legal matter, though, the circuit court could not ignore the family's turbulent past—not just as an indicator of the future, but as part of the *continuing* picture of neglect that has overshadowed, and continues to overshadow, Priscilla's young life. And when we look at what the court did and did not consider as part of our review—which we do as an initial matter—we find that the court considered an appropriate range of information and, therefore, did not abuse its discretion.

## B. The Circuit Court Did Not Err In Adjudicating Priscilla A CINA Based On Neglect.

The question before the circuit court, and the master before that, was whether the parents' conduct rose to the level of "neglect." FL § 3–801(s). We considered the meaning of "neglect" in *In re Andrew A.*, 149 Md.App. 412, 815 A.2d 931 (2003), where the trial court had construed the current language of FL § 3–801(s) to prohibit it from relying on a *previous* finding that Andrew's older brother had been deemed a CINA to determine whether the mother had *also* neglected Andrew. *Id.* at 415–17, 815 A.2d 931. We disagreed, holding that neglect could exist "without *actual* harm to the child" (*i.e.,* through the "*substantial* risk of harm"). *Id.* at 418, 815 A.2d 931 (emphasis added). The court also held that proof of neglect of a sibling could be relevant, depending on the circumstances. *Id.; see also Dustin T.,* 93 Md.App. at 735, 614 A.2d 999.

 It makes sense to think of "neglect" as part of an overarching pattern of conduct. Although neglect might not involve *affirmative* conduct (as physical abuse does, for example), the court assesses neglect by assessing the *inaction* of a parent over time. To the extent that inaction repeats itself, courts can appropriately view that pattern of omission as a predictor of future behavior, active or passive: "[it] has long been established that a parent's past conduct is relevant to a consideration of the parent's future conduct. Reliance upon past behavior as a basis for ascertaining the parent's present

and future actions directly serves the purpose of the CINA statute." *In re Adriana T.*, 208 Md.App. 545, 570, 56 A.3d 814 (2012) (citations omitted). Differently put, "[c]ourts should be most reluctant to 'gamble' with an infant's future; there is no way to judge the future conduct of an adult excepting by his or her conduct in the past." *McCabe v. McCabe*, 218 Md. 378, 384, 146 A.2d 768 (1958). And of course, we need not and will not wait for abuse to occur and a child to suffer concomitant injury before we can find neglect: "The purpose of [the CINA statute] is to protect children—not wait for their injury." *In re William B.*, 73 Md.App. 68, 77–78, 533 A.2d 16 (1987).

In *Dustin T.*, we affirmed a circuit court's refusal to return Dustin to his mother based not (as mother argued) on her alcoholism alone, but on a "plethora of factors," among them continuing drug abuse and "consorting with unsavory characters." 93 Md.App. at 734, 614 A.2d 999 (emphasis omitted). We also rejected the mother's argument that DSS had failed to show she had neglected Dustin. We stressed again that a court need not wait for an injury to occur before finding neglect, *id.* at 735, 614 A.2d 999, and held specifically that the court can and should consider any history of neglect:

> The court may find either neglect or abuse if the child is merely *placed at risk* of significant harm. In other words, we believe that [DSS] has a right—*and indeed a duty—to look at the track record, the past, of [mother] in order to predict what her future treatment of the child may be.* We believe that the juvenile court correctly determined that, *under the totality of the circumstances* (including [mother's] track record), Dustin would be placed at risk of harm if he were returned to his mother at that time.

*Id.* (first emphasis in original; remaining emphasis added).

We disagree with Father, then, that the circuit court erred in considering his criminal record or prior alcohol abuse. *First*, although the master and the circuit court mentioned the family's history of alcohol and substance abuse, domestic violence and DSS involvement, both were careful to distinguish information about the *inadmissible* prior records from

history that was relevant to the current CINA case. *Second,* the record was replete with evidence of *current* problems with the physical environment at Priscilla's house, and beyond the home itself, that had nothing to do with past history and that provided abundant support for a CINA adjudication.

### 1. The distinction between the parents' prior records (inadmissible), and the parents' history with DSS and Priscilla (admissible).

■ There are two types of history at issue: Father's and Mother's prior records (as suggested by documents not a part of this case) and the family's prior involvement with DSS (as indicated in the report and testified to by DSS workers). Consideration of prior court cases relating to Father should not have been, and were not in fact, a part of the court's decision about Priscilla. The master was careful to acknowledge that she knew of the parents' criminal, traffic and domestic violence histories, but then backed away from considering them: "I mean to say right from the get-go that although I allowed a lot of hearsay in this, *I did not rely on it,* and I'll tell you why, I felt like I had enough other evidence." (Emphasis added.)

The master's mention of Father's "run-ins with the Court in other venues" might seem superficially to give Father an opportunity to argue that the new CINA finding was based in part on his criminal record. He fails to acknowledge, though, the master's explicit statement that those "run-ins" played no part in her decision. And the circuit court was equally clear that it did not base its finding on other cases involving the parents, but that "the context of history" *with DSS* led him to deny the exceptions and find neglect.

Both the master and the circuit court were right, under *Andrew A.* and *Dustin T.,* to consider the parents' history with DSS in assessing the allegations of domestic violence, substance abuse or alcohol abuse here and, more to the point, Father's credibility in denying them. This same child had been found a CINA less than two years before. DSS's continuing investigation gave DSS ample reason to suspect

neglect in September 2012, and the similarity of the current allegations to the facts underlying Priscilla's most (and still very) recent CINA adjudication could hardly be denied. To the extent that the court hearkened back to the family's DSS history, it did so only as it bore specifically on the question of the care Priscilla was (or was not) receiving at present.

The court made this clear in two ways. *First*, the court explained that the record (through the DSS notes) supported a finding that the substance abuse and alcohol abuse currently prevalent in the home were the "primary cause" of the prior CINA case and the reasons that DSS became involved with the family in the first place. The court looked, in the context of that history, at "the testimony that came at the last hearing and it's quite clear that the alcohol issues that permeate this household and created the problems, the insecurity, instability for Priscilla continue, they're *unresolved.*" (Emphasis added.) This question came down not simply to consideration of history, but the question of whether Father could be *believed* when he said he did not have a problem with alcohol (he testified that he drank "whenever [he felt] like it," and by the circuit court's reckoning had made no "meaningful progress in relation to a recognized problem.") The court was free to disbelieve Father's assertion, and we find no clear error in that conclusion. The same was true with respect to substance abuse—Father and Mother never followed up on the DSS referral for substance abuse, and the finder of fact was free to draw appropriate inferences from that fact.

*Second,* although the circuit court found domestic violence to be an "ongoing problem" as well, he pointed out that Grandmother and Carol P. both provided specific testimony regarding ongoing and near-incessant confrontation (Grandmother) of an extreme nature (Carol P.). The "history" of confrontation went back no more than one season before the investigation began and undoubtedly could—and should—play a role in any consideration of whether Priscilla was still suffering from neglect. The court credited Grandmother's estimate that the couple argue about "80 percent of the time," as well as the testimony about the Summer 2012 incident in

which Mother called Carol P. as she cowered behind a trailer after a fight with Father, law enforcement officers on the way, and asked Carol P. to take care of Priscilla if anything happened to her. A finder of fact could readily find Carol P.'s account—to which Father's counsel did not object—more credible than Father's testimony (and indeed his claim in his brief) that there had been no domestic violence since the close of the first CINA petition in 2012.

We also note that, from an evidentiary standpoint, the existence of the prior CINA proceeding came in legitimately. Neither the master nor the court needed to take judicial *notice of it,[4] because they *properly considered testimony* regarding Father's failure to change the circumstances that led to the finding of neglect in the first place. (Although Father argues that the master's mention of her "off-the-record" knowledge about those proceedings "were made in a testamentary fashion" and were "clearly necessary to reach the CINA finding," that was not the case: the testimony we refer to came from the witnesses.) The underlying information regarding the original circumstances came in not through any transcript or pleadings from that prior proceeding, but from Ms. Brown's testimony, her notes (admitted as Exhibit 1), and the testimony of Carol P. and Grandmother. And in any event, Father did not object to discussion of the prior CINA case before the master (which, again, arose during witness testimony, not as the master rendered her opinion). *See, e.g., Hall v. State*, 69 Md.App. 37, 63, 516 A.2d 204 (1986) (sentencing judge property considered defendant's service of

---

4. For what it's worth, the master and the circuit court would have been on firm ground if they had taken judicial notice of the earlier CINA proceedings. In *In re Nathaniel A.*, 160 Md.App. 581, 864 A.2d 1066 (2005), the transcript of a prior CINA petition was introduced, but the mother elected not to put on other evidence to show that she had changed the conditions that compelled the CINA finding in the first place. *Id.* at 600–01, 864 A.2d 1066. We held that the hearing judge gave ample opportunity to the mother to "present evidence of changed circumstances," *id.* at 601, 864 A.2d 1066, which she failed to do. In the course of the discussion we surveyed numerous cases where courts had judicially noticed prior CINA cases, including the documentary evidence offered in those cases. *Id.* at 598 n. 1, 864 A.2d 1066.

*prior* sentence in imposing enhanced punishment, even though there was nothing formally entered into evidence regarding that prior sentence, where the existence of the previous conviction and sentence could not be denied as a practical matter).

Father continued to dispute whether Priscilla should have been found a CINA previously (and certainly tried to argue about it), but he could not deny that she had been. Moreover, counsel for Father never requested authentication or verification of the record of the prior CINA case—realistically, Father was in no position to deny the existence of the prior CINA petition or the allegations and findings in that case, so the court's awareness and consideration of that undeniable fact could not have caused him any prejudice. *See Reed v. Balt. Life Ins. Co.,* 127 Md.App. 536, 559, 733 A.2d 1106 (1999) (where appellant's counsel did not contest the veracity of the information considered by the court, the trial court's knowledge of it was not "extra-judicial" and no prejudice followed). And although the circuit court determined it to be of "evidentiary relevance," *see Andrew A.,* 149 Md.App. at 418, 815 A.2d 931, the court went on to stress that the master's *most* important finding, disregarding Priscilla's statements and other hearsay, was the "other, independent evidence" that we discuss below.

*Finally,* as a practical matter, the master knew about Father's background and the CINA proceeding not because *any* party went out of its way to introduce that evidence, but because she had overseen the prior CINA case herself. As Priscilla's counsel points out in her brief, Worcester County has only one juvenile master who hears all CINA cases, so her continuing involvement was inevitable. Father can't expect the master to repress the past, particularly when the new CINA proceeding followed so closely on the heels of the prior one and reflected the same underlying problems—indeed, we required in *Dustin T.* that the master consider the fact of the prior proceeding. 93 Md.App. at 735, 614 A.2d 999. But in any event, we are comfortable that the master's palpable frustration with Father's lack of progress in areas that have

affected him and his family for years did not infect her decision, even if that frustration might have been better expressed. *See In re Beverly B.*, 72 Md.App. 433, 442, 530 A.2d 766 (1987) (even though trial judge "did not delineate as clearly as he might have the reasons for his decision," review of the record convinced the appellate court that "the reasons underlying his decision are supported by the record").

## 2. The remaining evidence before the court supported the decision to find Priscilla a CINA again.

 Even as it pointed to the particulars of the parents' history with DSS, the circuit court also specifically identified *present* circumstances that supported the master's decision to find Priscilla to be a CINA yet again (again noting the difficulty that when looking at neglect, rather than abuse, one cannot so easily point to a particular act):

- *The condition of the home:* The court described the house as "dirty, cluttered, and there was debris both inside and outside and there [were] some concerns about structural safety of the house," with no indication that the issues had been addressed adequately to render the house safe for Priscilla to return. Ms. Jones testified that she did not feel safe in the home, and the court did not err in concluding the conditions were unsafe.

- *Priscilla's appearance after being with her parents:* The court pointed to Carol P.'s testimony "that often when [Priscilla] came from a stay with the parents that her hair was matted, dirty, and unbathed for periods of time, edgy, anxious, asking many questions, repeating herself. . . . And it's indicative of an angst and an insecurity when she returns, and then eventually that calms and mellows out."

- *Priscilla's improved condition and appearance upon staying with the Caregivers:* As the court put it, the "independent witnesses agreed" that Priscilla was "more appropriate, cleaner, happier," now that she was with the Caregivers—whom the circuit court emphasized had played an "ever present role" in Priscilla's life. And we disagree with Father's contention that the circuit court

could not conclude, without benefit of an expert, that Priscilla didn't feel safe in her parents' home. Although there are areas of testimony only fit for experts, *see, e.g., Ragland v. State*, 385 Md. 706, 720–21 [870 A.2d 609] (2005) (limiting lay-witness testimony to perceptions of events, rather than opinions that rely on specialized knowledge), the DSS worker's testimony about her observations of Priscilla are factual observations, not expert conclusions.

- *Medical neglect—spider bite:* The court observed that the events surrounding the spider bite were not the most serious it had come across but that the incident was alarming nonetheless and, significantly, supported DSS's findings about the deteriorated condition of the home, where the bite occurred. There may be worse cases of medical neglect, but the court did not err in finding "a shortcoming ... on the part of the parents that posed a serious threat to the child."

- *Medical neglect—general;* The Court noted that Grandmother took Priscilla to the doctor because she assumed that Mother and Father would not. This testimony specifically contradicted Father's claim that he had taken Priscilla to well-child visits "numerous" times, and that Grandmother only did so when he couldn't. This was a simple question of whom the court chose to believe, and the court was free to believe either party.

- *Education:* The court found a "lack of attention paid to [Priscilla's] educational needs," although the court conceded that Father spent time with Priscilla doing homework. The court did not err in concluding that Priscilla was a year behind in reading and considering that fact as part of its overall finding of neglect, even if it could not support such a finding on its own.

- *Mother's no—show for visitation:* The court did not err in considering the incident where Mother failed to make a morning visit to Priscilla at Grandmother's house and Priscilla's disappointment:

[I]t seems to be something that based on the testimony is a recurring theme, and I can't tell you how damaging something like that is potentially to or is to a child because we know the significance of these bonds, these bonds where children feel secure with a caregiver, come to rely on their caregiver. And things like that, although it may be something that's not that significant to the caregiver is very important and very significant and potentially damaging to the child ... and I think that point is well taken and it's not an isolated incident based on the testimony.

The court acknowledged that these problems or incidents might not, standing alone, rise to the level of neglect. But the master and the circuit court properly considered the totality of Priscilla's circumstances; as the court put it, "taken together in the context of history the Court is satisfied after exercising its independent judgment that the facts alleged in the petition, the CINA petition, were sustained below." The family's history with DSS provided the court with an appropriate context for its decision. *See Dustin T.*, 93 Md.App. at 735, 614 A.2d 999. The court considered the entire picture of Priscilla's care, of which her parents' past and present behavior was but a part, and it used that context as a way to measure the state of Priscilla's environment now and going forward. The circuit court did not abuse its discretion in finding that Father (and Mother) were not providing Priscilla with a safe environment.

### C. The Court Did Not Err In Committing Priscilla To The Shared Custody Of Grandmother And The Caregivers.

The court did not err in deciding to place Priscilla with Grandmother and the Caregivers (and really, Father's claim that it did is only cursory). Contrary to Father's claim, at the time of the hearing before the master and thereafter in front of the circuit court—where the parents specifically *waived* the right to a *de novo* hearing—he and Mother had *not* remedied the problems identified by the master sufficiently to permit Priscilla to return to their custody. Although Mother

and Father "agreed to participate" in DSS services, they had not done so at the time of the circuit court hearing: they had not undergone substance abuse evaluations; they had not *completed* couples counseling; and the repairs in the home were "close" but not finished. Again, we need not wait for harm to happen, *William B.*, 73 Md.App. at 77–78, 533 A.2d 16, and our review confirms that the trial court did not abuse its discretion in placing Priscilla with Grandmother and the Caregivers.

**JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**